**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

Filed/Docketed
Apr 10, 2018

In re:                                              )
                                                    )
QUIROZ, JUVENTINO GAYTON,          )        Case No. 15-10292-R
                                                    )        Chapter 7
                    Debtor.                 )

_____

JUVENTINO GAYTON QUIROZ,           )
                                                    )
                    Plaintiff,              )
                                                    )
vs.                                                 )        Adv. No. 16-1027-R
                                                    )
UNITED STATES OF AMERICA,          )
ex rel. INTERNAL REVENUE               )
SERVICE,                                        )
                                                    )
                    Defendant.               )


## MEMORANDUM OPINION

Plaintiff Juventino Gayton Quiroz ("Gayton")[1] filed this adversary proceeding against

Defendant United States of America, ex rel. Internal Revenue Service (the "IRS") to obtain

a declaration that federal income taxes owed for tax years 2005, 2006, 2007, 2009, and 2011

were discharged under 11 U.S.C. § 523(a)(1)(A)[2] when Gayton received his general

discharge in Bankruptcy Case No. 15-10292.  After the IRS answered the complaint, Gayton

stipulated that his 2007 tax liability was excepted from discharge under § 523(a)(1)(B), and

_____

[1]In the bankruptcy case and in this adversary proceeding, the parties refer to the
Plaintiff as "Gayton" and the Court will do the same, even though everyone agrees that
Plaintiff's name is really "Gaytan."

[2]Unless otherwise stated, all text references to "§" herein relate to sections of the
Bankruptcy Code, title 11 of the United States Code.

that his 2011 tax liability was non-dischargeable under §§ 523(a)(1)(A) and 507(a)(8).  A partial judgment declaring the 2007 and 2011 taxes non-dischargeable was entered on August 11, 2017.[3]

The IRS contends that the income taxes owed for tax years 2005, 2006, and 2009 are excepted from discharge because Gayton, after learning that his 2005 and 2006 tax returns were to be audited, "willfully attempted . . . to evade or defeat" payment of taxes.[4]  As evidence of willful evasion, the IRS contends that Gayton (1) "ha[d] a long history of ignoring his obligations" to pay taxes; (2) "understated his income on tax returns for subsequent years"; (3) "fail[ed] to keep adequate books and records"; (4) "willfully undervalued his residence by several hundred thousands of dollars" in statements made in connection with an offer in compromise of the unpaid taxes; (5) "refused to sell [his residence] or borrow against the equity in the property to pay his tax liabilities"; and (6) "failed to make any meaningful attempt to pay his federal tax liabilities."[5]  In addition, the IRS points to evidence that Gayton "willfully chose to spend his funds on discretionary items instead of paying his federal tax liabilities."[6]  Specifically, the IRS contends that instead of paying his taxes, Gayton chose to renovate and expand his residence, purchase and lease expensive vehicles, maintain and feed two horses, gamble at casinos, and donate to charity.

––––––––––––––––––––

[3]Adv. Doc. 23.

[4]11 U.S.C. § 523(a)(1)(C).

[5]United States' Trial Brief ("Trial Brief") (Adv. Doc. 32) at 1.

[6]Id.

The matter was tried to the Court on December 14, 2017. Upon consideration of the stipulations of fact set forth in the Pretrial Order,[7] the evidence admitted at trial, the record in this proceeding, arguments of counsel, including the IRS's Trial Brief, and the applicable law, the Court finds and concludes as follows:

## I.    Jurisdiction

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1334, 157(a) and (b)(2)(I), and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

## II.    Findings of fact

### A.    Background

Gayton immigrated to the United States from Mexico in 1984 at the age of 14.[8] Initially Gayton worked with and for his brothers in the construction industry. In 1995, Gayton started his own painting and masonry business in the Tulsa area. His primary customers were homebuilders. In the early years, he employed three or four workers. As the economy improved and his business expanded, Gayton's workforce increased to approximately twenty-five. At its peak in 2005, Gayton's business provided painting services for multiple builders on multiple job sites simultaneously. In 2007, however, most

---

[7]Adv. Doc. 33.

[8]Although Gayton speaks and understands English, English is his second language. A certified interpreter attended the trial and translated everything stated in English into Spanish for Gayton's benefit, and translated Gayton's Spanish responses to English for the benefit of the attorneys and the Court.

of the construction and remodeling companies that Gayton worked with ceased doing business, and Gayton's business suffered accordingly.[9]

At all relevant times, Gayton knew he had a legal obligation to file personal and business income tax returns with the IRS to report his income and pay any taxes due. In 2005, 2006 and 2009, Gayton conducted his business as a sole proprietorship and reported his business income and expenses on Schedule C of his individual income tax return. At some point thereafter, Gayton began operating his business through a sub-chapter S corporation, and reported the corporation's income and deductions on Form 1120-S, and reported the corporation's net business income on Schedule E of his individual tax return.

Gayton's wife, Patricia, handled the bookkeeping for Gayton's business until 2007. Gayton has no training in financial management, accounting, or tax matters, and he relied upon Patricia and various accountants to maintain records and prepare tax returns. In 1998, Gayton hired Juan Cuevas, doing business as J & J Tax and Accounting, as his accountant. Cuevas was fluent in both English and Spanish and was able to translate documents written in English for Gayton. Cuevas prepared Gayton's tax returns and otherwise assisted him with tax matters from 1998 through 2007.

---

[9]For the purpose of context, the Court takes judicial notice that the economy during the early 2000's, and the construction sector in particular, was propped up by an artificially overheated housing market caused in part by indiscriminate lending practices and the packaging and selling of high risk mortgage-backed securities. In 2007-08, the market for sub-prime mortgage-backed securities collapsed and the housing bubble burst, ushering in the worst financial crisis since the Great Depression and dealing a severe blow to all constituents of the housing industry. See, e.g., Jerry W. Markham, The Subprime Crisis–A Test Match for the Bankers: Glass Steagall vs. Gramm-Leach-Bliley, 12 U. PA. J. BUS. L. 1081, 1104-06 (2010). The timing and extent of Gayton's fortunes coincided with the ups and downs in the housing industry in general.

When Cuevas retired in 2008, Gayton retained Paul Clarke as his accountant. In 2008, Gayton granted Clarke a power of attorney and appointed Clarke as his representative in connection with an audit of Gayton's 2005 and 2006 federal tax returns. Clarke also prepared and filed Gayton's 2009 federal return. Clarke did not speak Spanish and was not able to translate documents from English to Spanish. In 2011, Gayton again hired Cuevas as his accountant, and Cuevas prepared and filed returns for Gayton and his sub-chapter S corporation for tax years 2010 to 2014.[10]

B.   Accrual, reporting, audit, assessment, and efforts to pay and collect the tax liability: A timeline

Gayton timely filed his 2005, 2006 and 2009 federal income tax returns.[11] The return for tax year 2005, prepared by Gayton's accountant and filed in August 2006, calculated a tax liability of $9,193.00.[12] In September 2006, the IRS assessed late payment penalties and interest in the total amount of $483.44, bringing Gayton's liability for 2005 to $9,676.44.[13] Gayton paid the IRS $1,500.00 in estimated taxes in 2005, $5,000.00 in April 2006 (presumably when applying for an automatic extension of time to file), $4,562.00 when he filed his return in August 2006, and $950.00 in September 2008, for a total of $12,012.00.[14]

---

[10]Cuevas passed away prior to the filing of this adversary proceeding.

[11]Gayton's return for tax year 2007 was not timely filed and therefore his outstanding tax liability for that year was determined to be non-dischargeable. Gayton's return for tax year 2008 was timely filed and Gayton paid those taxes in full. IRS Account Transcript, Plaintiff's Exhibit 116, at 11-12.

[12]IRS Account Transcript, Plaintiff's Exhibit 116, at 1.

[13]Id. at 2.

[14]Id. at 1-2.

As Gayton had paid $2,335.56 more than originally due, the IRS applied $1,385.56 of the overpayment against taxes due for a different tax year.

Gayton's return for tax year 2006, prepared by Gayton's accountant and filed in October 2007, reflected a tax liability of $16,167.00.[15]  The IRS assessed late payment penalties and interest in the amount of $1,003.91 in late 2007, and additional penalties and interest in December 2008 and March 2009 of $413.31, increasing Gayton's liability for 2006 to $17,584.22.[16]  Gayton paid the IRS $10,000.00 in April 2007 (again, probably with the application for  automatic extension), $2,000.00 when he filed his return in October 2007, $2,628.00 in March 2008, $795.00 in October 2008, $900.00 in November 2008, $900.00 in December 2008, and $331.22 in February 2009.  In addition, the IRS credited $30.00 to Gayton's 2006 account in April 2007.[17]  Accordingly, the total amount paid for tax year 2006 was $17,584.22.

Gayton's return for tax year 2009, prepared by Gayton's accountant and filed in October 2010, reflected a tax liability of $1,296.00.[18]  The IRS assessed late payment penalties and interest in the amount of $95.11 in November 2007, increasing the liability for tax year 2009 to $1,391.11.[19]  No payments have been credited to Gayton's 2009 account.

---

[15]Id. at 5.

[16]Id. at 6.

[17]Id.

[18]Id. at 13.

[19]Id. at 14.

By letter dated April 16, 2008, the IRS first advised Gayton that his 2005 tax return had been "selected for examination."[20]  By letter dated June 9, 2008, the IRS first advised Gayton that his 2006 tax return had been "selected for examination."[21]  On August 7, 2008, the IRS auditor sent Paul Clarke, Gayton's accountant and agent under a power of attorney, an Examination Report preliminarily outlining the adjustments the IRS intended to make to Gayton's 2005 and 2006 income and deductions, and asked Gayton to "let [her] know whether you agree or disagree with the changes."[22]

On January 16, 2009, the IRS sent Gayton a letter advising him that the audit of his 2005 and 2006 returns indicated that he had not maintained adequate books and records to correctly calculate his federal tax liability.  The letter provided Gayton "official notice" that he was required by law to keep records containing the following information:

(1) The date and a description of each transaction you engaged in.
(2) The date and amount of each item of gross income received.
(3) A description of the nature of income received.
(4) The date and amount of each payment you made.
(5) The name and address of the payee.
(6) A description of the nature of each payment.[23]

An attachment to the letter disclosed the "Reasons for Inadequate Records Notice." The IRS suggested that Gayton keep a general ledger with balance sheets and income statements, weekly time sheets for each employee or worker, weekly receipts or canceled checks to

---

[20]IRS Exhibit 11.

[21]IRS Exhibit 12.

[22]IRS Exhibits 13 and 15.

[23]IRS Exhibit 16.

substantiate the deduction for labor costs, documentation of his gambling winnings and losses, copies of receipts for cost-of-goods-sold and materials, copies of bid sheets or billing statements Gayton issued to his customers and copies of the checks received in payment of such statements, records of his business cell phone use, and receipts or canceled checks to substantiate deductible expenses.[24]

In addition to maintaining records, the IRS also advised Gayton to deposit all gross business receipts into his business account, deposit and keep track of gambling winnings in his personal checking account, and double check the Social Security numbers of his workers to insure that they matched the Form 1099s issued to such workers.[25]

Based on the records Gayton had provided to the IRS, the IRS determined that Gayton lacked receipts or other written evidence to establish the full amounts of certain deductions claimed in 2005 and 2006. The IRS decreased the deductions to the amounts established by the evidence provided, and increased the amount of Gayton's self-employment tax accordingly.[26] The IRS also disallowed other deductions in their entirety.

---

[24]Id.

[25]Id.  See also Stipulation, PTO at 5, ¶¶ 20-21.

[26]IRS Exhibits 17-18.

On May 15, 2009, Gayton acquiesced in the IRS's adjustments to his 2006 tax return, and signed a consent to the assessment and collection of additional taxes, penalties, and interest in the amount of $18,184.51.[27]  On June 22, 2009, the 2006 liability was assessed.[28]

Gayton did not acquiesce in the adjustments the IRS made to his 2005 tax return, nor did he consent to the assessment and collection of additional taxes, penalties, and interest for tax year 2005.  On November 9, 2009, the IRS assessed additional taxes, penalties, and interest for the 2005 tax period in the amount of $151,224.53.[29]

On November 24, 2009, accountant Clarke, on behalf of Gayton, sent a letter to the IRS Appeals Division asserting Gayton's intent to appeal the audit findings on the ground that the auditor did not take into account certain documentation supporting expenses for labor, materials, and supplies, and requesting an appeals conference.[30]

Sometime in 2011, the IRS audited Gayton's 2009 tax return and again proposed adjustments.  The adjustments were necessary because Gayton's accountant erroneously entered business income and expenses on both Form1120-S and Gayton's Schedule C. Because of the duplication, the IRS disallowed all Schedule C income and deductions.[31] Gayton acquiesced in the IRS's adjustments, and on November 22, 2011, he signed a consent

---

[27]IRS Exhibit 17 at 2.

[28]Stipulation, PTO at 5, ¶ 23.  In 2009 and 2010, the IRS recorded notices of federal tax liens in the Tulsa County land records. Plaintiff's Exhibits 108-109.

[29]Stipulation, PTO at 5, ¶¶ 24, 25; IRS Exhibit 18 at 2.

[30]IRS Exhibit 20.

[31]IRS Exhibit 21 at 6.

to the assessment and collection of additional taxes and interest for the 2009 tax period in the amount of $6,102.97.[32]

In June 2013, Gayton granted accountant Cuevas a power of attorney and appointed Cuevas as his representative and agent before the IRS with respect to tax years 2005, 2006, 2007, 2008, 2009, and 2011.[33]  On June 19, 2013, Cuevas sent the IRS a letter on Gayton's behalf offering to settle Gayton's outstanding debt for tax years 2005 through 2011, which at that time totaled $263,298.00, for the sum of $11,912.00 (the "offer in compromise" or "OIC").[34]  Along with the OIC, Cuevas submitted three checks payable to the United States Treasury–one for the filing fee in the amount of $150.00, one in the amount of $2,382.40 representing twenty percent of the offer in compromise, and one in the amount of $397.07, representing the first monthly payment.[35]  Cuevas also submitted two completed IRS forms– Form 433-A entitled "Collection Information Statement for Wage Earners and Self-Employed Individuals" and Form 433-B entitled "Collection Information Statement for Businesses"– as well as bank records and other documents.[36]

In filling out Forms 433-A and 433-B, Cuevas posed questions to Gayton in Spanish, to which Gayton responded either verbally or with documents.  Cuevas typed the information given to him onto the forms, and calculated the amount that Gayton offered to the IRS in

---

[32]Id at 2.

[33]Stipulation, PTO at 8-9, ¶ 55.

[34]Stipulation, PTO at 9, ¶¶ 56-57.

[35]IRS Exhibit 2.

[36]IRS Exhibits 2, 3, and 42.

settlement of his tax liabilities. Gayton did not read the completed forms before he signed them, nor did he ask Cuevas to translate them into Spanish. Gayton did not understand the forms, or their contents, but he trusted Cuevas to complete the forms correctly.

The IRS requires a taxpayer making an offer in compromise to disclose on Form 433-A, under penalty of perjury, all income, assets, property, and rights in property, so that the IRS may evaluate a taxpayer's collection potential and determine whether accepting an offer in compromise is in the best interests of the United States.[37]  In his Form 433-A, Gayton listed the current fair market value of his personal residence at $72,000.00 and the current mortgage loan balance as $68,304.00, resulting in equity of $3,696.00.[38]  Gayton admits that the fair market value of his residence in 2013 was much greater than $72,000.00, and that he had it listed for sale at $875,000.00 at that time.[39]  He denies, however, that he knowingly misrepresented the value of the residence.  Gayton testified, credibly, that he does not know why Cuevas entered $72,000.00 on the form as the current fair market value, and that he did not know at the time he signed the form that it contained such a representation.

When a taxpayer making an offer in compromise owns a business, the IRS also requires the taxpayer to provide, under the penalty of perjury, certain financial information for the business on Form 433-B.  Gayton, as president of Juventino Gaytan Masonry, Inc., signed the Form 433-B that Cuevas had completed using financial information Gayton

---

[37]Stipulation, PTO at 9, ¶ 59.

[38]IRS Exhibit 3 at 3.

[39]Stipulation, PTO at 9, ¶ 61.

11

provided to him.  In the gross monthly income and expenses portion of the form, the taxpayer has a choice of providing average monthly income derived from the last three, six, nine or twelve months. Cuevas and Gayton designated the three month period of January 1, 2013 to March 31, 2013, as the reporting period, and reported that the corporation had gross monthly receipts of $96,009.00 and gross monthly expenses of $92,069.00, resulting in a monthly profit of $3,940.00[40] On his Form 433-A, however, Gayton reported his monthly net income from his business as $1,314.00[41]   Gayton testified, credibly, that he did not read or understand the forms Cuevas filled out on his behalf.

The IRS relies on the discrepancy between the corporation's monthly profit reported on Form 433-B and Gayton's net monthly business income reported on Form 433-A to show that Gayton misrepresented his net monthly business income.  It appears to the Court, however, that the amounts Cuevas entered on Form 433-B represented the corporation's gross receipts and expenses for the entire three month reporting period– from January 1, 2013 to March 31, 2013 – and that the calculated profit of $3,940.00 was not a monthly figure, but instead was the total amount accrued over the three month period.  The Court notes that $3,940.00 divided by three is $1,313.33, which is within pennies of the amount Gayton reported as his net monthly business income on Form 433-A.

The Court also notes that the corporation's 2013 tax return shows gross receipts of about $43,000.00 per month, much less than the $96,000.00 per month reported on Form

---

[40]Stipulation, PTO at 10, ¶ 62; IRS Exhibit 42 at 6.

[41]IRS Exhibit 3 at 4.

433-B.  The tax return also reports expenses and deductions of about $41,800.00 per month, and not $92,069.00 per month as reported on Form 433-B.[42]  The Court finds that Gayton's Form 433-B was incorrectly completed, in that the gross income and expenses for the three month period were not averaged to provide a monthly figure.  But the gross income and expense figures in Form 433-B, if averaged, are consistent with the net monthly income Gayton reported on Form 433-A.  The 2013 tax return confirms that the corporation's average gross monthly income and expenses resulted in about $1,200.00 of net monthly pass-through income to Gayton.  The Court finds that Gayton did not intentionally misrepresent his income on Form 433-A or Form 433-B.

On January 28, 2014, the IRS revenue officer who was assigned to examine Gayton's OIC requested additional information and records.[43]  Among other things, the revenue officer questioned the fair market value of Gayton's residence as follows:

> Internet valuation sites indicate your real estate consists of approximately 15 acres and a 6 bedroom residence with a combine [sic] fair market value of $317,000.  County records indicate that you purchased the property in 2004 at a cost of at least $127,000.  It would appear that the fair market value you listed for the property is grossly understated. Therefore, you will need to provide a current appraisal of the fair market value of the residence, acreage and any other improvements on the property.[44]

---

[42]IRS Exhibit 37.

[43]Stipulation, PTO at 10, ¶ 65.

[44]IRS Exhibit 43 at 3.

13

On February 28, 2014, Cuevas responded to the request by stating that Gayton "has no money for an appraisal."[45]   Cuevas sent a copy of the response to Gayton.[46]   The revenue officer testified at trial that because no appraisal was provided, he determined for the purpose of the OIC that the value of the real estate was $317,000.00, and that he advised Cuevas accordingly.[47]

On May 2, 2014, another IRS agent sent Gayton and Cuevas a letter rejecting the OIC because "[t]he amount offered is less than your reasonable collection potential."[48]   The IRS agent suggested that if Gayton increased his offer to $213,000.00, she would recommend that the IRS accept such offer.  During the period the IRS was considering the OIC, Gayton made eight additional payments to the IRS, each in the amount of $397.07.

On or about May 30, 2014, Clarke, on behalf of Gayton, submitted to the IRS a Request for Appeal of Offer in Compromise.[49]   As the reason for disagreeing with the rejection of the offer, Clarke wrote: "Taxpayer obviously has insufficient income to pay a higher amount on his offer in compromise.   Additionally we are appealing the audit findings."[50]   Again Gayton signed the document, but did not read it.  Gayton's tax return for

---

[45]IRS Exhibit 44; Stipulation, PTO at 10, ¶ 66.

[46]Stipulation, PTO at 10, ¶ 67.

[47]Testimony of Robert Randolph.

[48]IRS Exhibit 45.  The May 2nd letter refers to attachments that purportedly show how the IRS calculated "reasonable collection potential," but those attachments were not offered into evidence.

[49]Stipulation, PTO at 10, ¶ 70; IRS Exhibit 46.

[50]IRS Exhibit 46.

14

tax year 2013 (the year he submitted his OIC) showed adjusted gross income of $12,461.00, and his return for tax year 2014 (the year Gayton appealed the rejection of the OIC) showed adjusted gross income of $26,111.00.[51]

On February 26, 2015, Gayton filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.  The Chapter 7 Trustee filed a report stating that no assets were available for distribution to creditors. Gayton was granted a general discharge of dischargeable debts on June 2, 2015, and the case was closed on June 18, 2015.[52]

On April 8, 2016, the case was reopened upon Gayton's motion so that an adversary proceeding could be filed to determine the dischargeability of the unpaid federal income taxes.[53]  Gayton claims that the taxes were discharged because they do not qualify under any of the exceptions to discharge stated in § 523(a)(1).

C.     Facts relevant to IRS's assertion of willful evasion

The IRS contends that instead of paying taxes, Gayton spent funds on unnecessary discretionary items in the categories of home improvements, luxury vehicles, horses, casino gambling, and charity.  As other evidence of willful evasion, the IRS contends that Gayton has refused to sell his residence or borrow against it to pay his tax liabilities; misled the IRS about the value of the residence on the OIC and failed to disclose a prior appraisal of the

---

[51]IRS Exhibits 31 and 33.

[52]Main Case Docs. 13, 15.

[53]Main Case Docs. 16, 17.

residence; understated his income on tax returns in the years after the audits; and failed to keep adequate books and records.

      1.   *The residence*

In October 2001, Gayton purchased as his homestead a 14.5 acre tract of real property on which stood a one-story 2,200 square foot residence and a horse barn (the "Homestead").[54]  Gayton financed some or all of the $177,000.00 purchase price, and has made mortgage payments, including ad valorem taxes and insurance, of approximately $1,400.00 per month since 2001.[55]

In 2005, Gayton built a stand-alone shop/storage building on the Homestead, installed a brick wall on the barn, painted the barn, and built a handball court.[56]  Gayton paid cash for the materials as they were used, the total cost of which he estimated at $40,000.00.[57]  Gayton did not pay for labor; he performed most of the labor himself with the assistance of friends and relatives in the construction industry.

In 2006, Gayton installed wood floors, tile, and crown molding in the residence, added a jacuzzi tub, remodeled the kitchen, and built a fence and a gate.[58]

In or about 2007, Gayton decided to add a second floor to the residence that resulted in doubling the size of the home.  He began the renovation in 2007 and completed it

---

[54]IRS Exhibit 22 at 3. Stipulation, PTO at 6, ¶¶ 30, 32.

[55]Stipulation, PTO at 6, ¶ 31.

[56]IRS Exhibit 22 at 3.

[57]Id.

[58]Id.

sometime between 2012 and 2014.[59]  Over the years, Gayton and his friends and relatives collected discarded materials from worksites, and these materials were eventually incorporated into the renovation. Again, Gayton did not pay for labor; he performed most of the work himself or with the help of experienced friends.[60]  Work on the exterior was finished in 2009.[61]

In December 2009, Gayton retained an appraiser to appraise the Homestead.[62]  The appraisal was made "subject to completion per plans and specifications on the basis of a Hypothetical Condition that the improvements have been completed."[63]  Further, the appraisal was made on "the hypothetical condition that all ongoing construction on the subject property is complete and the final product is in average or better condition when compared to the surrounding area."[64]  The photos attached to the appraisal show that the second story interior of the residence was under construction and far from finished.[65]  Subject

---

[59]Id.  Stipulation, PTO at 6, ¶ 33.

[60]Stipulation, PTO at 6, ¶ 34.

[61]IRS Exhibit 22 at 3.

[62]Stipulation, PTO at 7, ¶¶ 39-40.

[63]IRS Exhibit 1 at 6.

[64]Id.

[65]Id. at 10.

to the conditions, the Homestead was appraised at $765,000.00 as of December 3, 2009.[66] Gayton received a copy of the appraisal.[67]

Over the course of the next three to five years, Gayton continued collecting discarded and surplus materials to finish the second floor interior.  The second floor currently consists of three bedrooms, two baths, a balcony, a game room, and a living room.[68]  Although Gayton did not maintain receipts, he testified, credibly, that he spent less than $5,000.00 out of pocket for materials.  He paid discount prices for carpet, sheetrock, tile, shingles, and appliances, some of which he found on Craigslist.  Other building materials were given to him by homebuilders he worked with or were scavenged from discarded materials at jobsites.[69]  During that time, he also purchased an air conditioning unit for $2,200.00 and a 70-inch television for $700.00.

Gayton lives in the residence with his girlfriend and their son, and with a daughter from a previous marriage on a joint custody basis.  They do not use the second floor as their living space.  Gayton has four other children and a grandchild who often spend weekends with Gayton and use the second story.  When Gayton's family visits from Mexico, they also reside in the second story addition.

_____

[66]Id. at 6; Stipulation, PTO at 7, ¶¶ 41-43.

[67]Stipulation, PTO at 7, ¶ 44.

[68]Stipulation, PTO at 7, ¶ 35.

[69]Gayton explained that a friend that owned a construction company would allow him to pick up wood left over after framing, and Gayton collected wood of various dimensions over several years.  Also, builders would give him windows that were discarded as defective. The windows he incorporated into his home were from different jobs and do not match.  The roof is made up of shingles from different lots.

Between 2008 and 2016, Gayton listed the Homestead for sale at various times with asking prices ranging between $575,000.00 and $899,000.00.[70]  In his bankruptcy schedules, Gayton valued the Homestead at $441,912.00.[71]  Gayton recently attempted to obtain a home equity loan to pay his tax debt. He applied to three financial institutions, but his applications were rejected because his credit reports include negative information resulting from his 2015 bankruptcy filing.

### 2.   The horses

In 2002, Gayton purchased one horse for $1,800.00, and in 2007, he purchased another horse for $1,200.00.[72]  Gayton's family members rode the horses for pleasure and in rodeos.[73]  On an annual basis, Gayton spent approximately $1,440.00 to feed the horses and approximately $320.00 to $480.00 for veterinary care.[74]

### 3.   The vehicles

In 2007 and 2008, Gayton made lease payments on a 2007 Cadillac Escalade in the amount of approximately $700.00 per month.[75]  From some point in 2011 to April 2012, he

---

[70]Stipulation, PTO at 7, ¶ 38 and at 8, ¶ 48.

[71]IRS Exhibit 39 at 8.

[72]Stipulation, PTO at 8, ¶ 49.

[73]Id., ¶ 50.

[74]Id., ¶¶ 53, 54.

[75]Stipulation, PTO at 3, ¶ 9.

made payments of approximately $800.00 per month on a 2011 Jaguar.[76]  The Jaguar was titled in Gayton's name, and not in the name of his business.[77]

On April 17, 2012, Gayton traded the Jaguar for a 2012 Ford Truck[78] and applied to Ford Credit for a purchase money loan.  The application for credit includes a representation that Gayton, as owner of his corporation, had a "gross monthly salary" of $9,000.00.[79] Gayton credibly testified that the Ford salesperson asked him various questions, filled out the application on Gayton's behalf, and presented it for Gayton's signature. Gayton signed the application without reading it because he is not proficient in reading English.

Gayton testified that he purchased or leased nice vehicles to gain the respect of potential customers.  Gayton admits that he could have driven less expensive vehicles, but he believed that it was important to his business to appear successful and trustworthy, and that driving a clean late model car or truck represented those attributes.  He also owned a Chevy van that his crew used for transporting tools, ladders, machines, etc. to the job sites.

### 4.  *Gambling*

On his 2005 tax return, Gayton deducted from his income gambling losses in the amount of $61,700.00.[80] On his 2006 tax return, he deducted gambling losses in the amount

---

[76]Id., ¶ 10.

[77]Id., ¶ 11.

[78]IRS Exhibit 26.

[79]IRS Exhibit 40.

[80]Stipulation, PTO at 11, ¶ 72.

of $18,979.00.[81]   In 2009, the IRS disallowed these deductions in full or in part due to insufficient documentation of winnings and losses.  Part of the tax liability outstanding for 2005 and 2006 resulted from disallowance of these deductions.

Gayton's bank records reflect that between 2010 and 2016, Gayton withdrew a total of $34,687.26 from his personal and business bank accounts through ATMs located inside casinos.[82]   The IRS did not establish what Gayton did with the funds he withdrew, although Gayton admits that he did gamble occasionally for entertainment, and that he redeposited any winnings or leftover funds back into his bank account.

5.     *Charity*

In 2010, Gayton made a $4,000.00 donation to his church[83] for the purpose of allowing the church to buy materials to remodel a building to provide housing for Mexican immigrants.  Gayton also donated his time and services to the project.

6.     *Representation of income*

On his 2010 through 2014 personal income tax returns, Gayton reported the following adjusted gross income:

2010 - $20,512.00
2011 - $33,627.00
2012 - $16,462.00
2013 - $12,461.00

---

[81]Stipulation, PTO at 11, ¶ 73.

[82]Stipulation, PTO at 11, ¶ 74.

[83]Stipulation, PTO at 12, ¶ 77.

21

2014 - $26,111.00[84]

In 2010 to 2013, Gayton's adjusted gross income was the S-corporation's net business income as reported on Schedule K-1s.  In 2014, the adjusted gross income included gambling winnings and capital gains as well as net business income.

On his bankruptcy schedules, Gayton reported net monthly business income of $6,136.67 and monthly expenses of $5,727.00.  In his 2016 deposition, Gayton agreed that his income and expenses had been fairly consistent since 2010.  The IRS contends that because the income reported on the tax returns from 2010 to 2014 is inconsistent with the income reported on the Schedule I filed with this Court, and Gayton admitted that his income and expenses had been steady for the last six years, Gayton significantly understated his income to the IRS during these tax years.  The inconsistency, without more, is insufficient to establish intentional underreporting of income, however.

First, the Court notes again that Gayton is not a sophisticated business owner.  He has developed expertise in multiple trades and has decades of experience in the home construction industry, but has depended on others to assist him in his financial affairs and in complying with applicable laws and regulations.  In or about 2010, Gayton's accountant set up the S-corporation through which Gayton did business.  Gayton maintained checking account and vendor records to account for receipts and expenses.  He provided his records to his accountant, who prepared the S-corporation's 1120S returns.  The corporation issued

---

[84]Stipulation, PTO at 3, ¶ 13.  Generally, with a few exceptions, the income reported on Gayton's personal tax returns was equal to the corporation's net income that passed through to Gayton for tax purposes.

K-1 Forms representing the corporation's net income after all losses, deductions, and credits, which passed through to Gayton for income tax purposes. The pass-through income is net of depreciation and other deductions that do not correlate with actual cash expenditures, so the amount reportable on the shareholder's personal return has been reduced by the non-cash deductions for tax purposes.

The corporation's returns, the K-1s, and Gayton's personal returns were prepared by Gayton's tax professionals from records provided by Gayton. There was no evidence offered to support any inference that Gayton withheld documents or information or otherwise did anything to cause underreporting of income, if any, for income tax purposes.

7.  *Recordkeeping*

Gayton did not (and does not) have a computer because he does not know how to use one, so he lacked the ability to create and print out financial reports using financial software such as Quicken. During 2005 and 2006, Gayton's wife helped with bookkeeping and maintaining records. Thereafter, Gayton maintained his business records.

After the IRS notified Gayton in 2009 that his recordkeeping was inadequate, Gayton discontinued all cash transactions.[85] Gayton ran all income through his checking account and paid all expenses by check so that the bank records reflected all his financial transactions. Gayton kept statements or invoices that he billed to customers. Vendors that sold paint and other materials to the business provided Gayton with annual statements to document the cost of materials and supplies. Gayton also kept track of his labor costs in his checkbook and

---

[85]One worker preferred to be paid in cash and Gayton kept receipts of such payments and his accountant issued a Form 1099 to that worker.

with canceled checks.  He did the best he could to keep records in accordance with the requirements set forth by the IRS.

D.    Facts relevant to Gayton's state of mind

After carefully listening to Gayton's narrative and assessing his demeanor at trial, the Court finds that Gayton was a credible witness.  His demeanor was direct and non-evasive. He attempted to respond to questions posed by counsel and the Court as best as he could. He admitted when he did not know or remember events, and he readily admitted facts that were not favorable to him.  For instance, he admitted to not reading documents before signing them.

The Court finds it more probable than not that Gayton did not fully understand the content of his tax returns or the representations made therein with respect to income and deductions reported.  Gayton knew that he had no background in financial or tax matters, and therefore appropriately sought assistance from professionals and trusted them to properly complete the forms based on the raw financial information he provided to them.  Likewise, Gayton retained professionals to assist him when the IRS gave notice of its intent to audit his returns, and again when he attempted to settle the debt through the OIC process. He provided information requested by his professionals to the extent he understood what was requested.

The Court does not condone the practice of signing documents under penalty of perjury without reading them, or in this case, without having the documents carefully translated into Gayton's native language before attesting to their accuracy.  But that is what happened, and that fact is relevant to determining Gayton's state of mind when he filed his returns and submitted his offer in compromise.  Because of the language barrier, Gayton's

struggle to understand financial concepts (*i.e*., ledger, balance sheet, equity), and the byzantine nature of tax law and procedure, it is more likely than not that translating the documents into Spanish would not have assisted Gayton in understanding why his accountants entered the numbers they did on the tax returns and other statements submitted to the IRS.

### III.    Conclusions of law

####    A.    Legal standard

Section 523(a)(1)(C) excepts from discharge any tax debt "with respect to which the debtor . . . willfully attempted in any manner to evade or defeat such tax."[86]  Exceptions to discharge are strictly construed in favor of providing relief from the burden of crushing debt to the honest but unfortunate debtor.[87]  To establish a willful attempt to evade or defeat taxes, the IRS must prove (1) that the debtor engaged in conduct to evade or defeat taxes (the "conduct" component) and (2) that the debtor did so "voluntarily, consciously or knowingly, and intentionally" (the mental state, or "willfulness," component).[88] The IRS has the burden of proving that taxes are non-dischargable by a preponderance of the evidence.[89]

The conduct component includes actions intended to avoid not only the assessment of taxes but also the collection thereof, such as "keeping a double set of books, making false

---

[86]11 U.S.C. § 523(a)(1)(C). The statute also excepts from discharge taxes resulting from a fraudulent return, but the IRS does not allege that Gayton's returns were fraudulent.

[87]Dalton v. IRS, 77 F.3d 1297, 1300 (10th Cir. 1996).

[88]In re Vaughn, 765 F.3d 1174, 1181 (10th Cir. 2014), *quoting* Dalton, 77 F.3d at 1302. See also In re Birkenstock, 87 F.3d 947, 952 (7th Cir. 1996).

[89]Dalton, 77 F.3d at 1302.

entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal."[90]   "[N]onpayment [of taxes], by itself, does not compel a finding that the given tax debt is nondischargeable.  Rather, nonpayment is relevant evidence which a court should consider in the totality of conduct to determine whether or not the debtor willfully attempted to evade or defeat taxes."[91]   Section 523(a)(1)(C) "encompasses the various schemes, including concealment, by which tax evasion may be accomplished."[92]

The willfulness component is a quintessential question of fact to be determined from the totality of the record, and willful attempts to evade may be inferred from the debtor's conduct vis-a-vis the unpaid taxes.[93]  Intent may be inferred from the debtor's words and deeds, sophistication, knowledge of certain facts and circumstances, timing of questionable conduct, and the probability that such conduct could defeat or obstruct assessment, collection or payment of taxes, among other things.

---

[90]Id. at 1301, *quoting* Spies v. United States, 317 U.S. 492, 499 (1943) (wherein the Supreme Court interpreted the phrase "willfully attempts in any manner to evade or defeat any tax . . . or the payment thereof" (id. at 494 n.2) in criminal tax evasion cases to require a "tax-evasion motive" that may be inferred from particular conduct (id. at 499)).

[91]Dalton, 77 F.3d at 1301.

[92]Id. at 1302.

[93]Id.

Before evaluating whether the IRS proved that Gayton willfully attempted to evade

his tax debt, the Court must resolve the parties' dispute as to what state of mind the IRS must

establish in order to prevail.  In denying in part the IRS's motion for summary judgment, this

Court concluded that to except taxes from discharge under § 523(a)(1)(C), the IRS would

have to prove at trial that Gayton "subjectively intended to evade or defeat" his tax debt.[94]

In the Pretrial Order, the IRS preserved its right to argue that it need not prove subjective

intent.[95]  In its Trial Brief, the IRS contends that it only must establish "that Gayton engaged

in *conduct that resulted in non-payment of the tax liabilities*, and, [that] at the same time,

Gayton knew he owed the taxes."[96]  Although the statute unambiguously states that *attempts*

*to evade or defeat taxes* must be willful, the IRS contends that it need not prove that Gayton

---

[94]Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment (Adv. Doc. 22) at 4.

[95]PTO at 16.  The IRS posed the legal issue as follows:

Whether § 523(a)(1)(C)'s willfulness standard is *subjective*, requiring the Government to show that the debtor specifically intended to evade or defeat the tax debt, or, *objective*, only requiring the Government to show that the debtor willfully committed an affirmative act of commission or omission that constitutes an attempt to evade or defeat tax liabilities, within the meaning of 11 U.S.C. § 523(a)(1)(C).

Id. ¶ 8(C) (emphasis original).

[96]Trial Brief at 8 (emphasis added).  The IRS claims that it must prevail, perhaps as a matter of law, because it is undisputed that Gayton knew he had a legal duty to pay taxes since 2009, and that instead of paying his taxes, he spent his income on non-essential items, such as gambling, leasing expensive cars, keeping horses, and improving the Homestead. The IRS adds under-reporting of income, intentionally misrepresenting the value of the Homestead, and refusing to liquidate the Homestead as aggravating factors, or as additional evidence of Gayton's state of mind, but the Court finds that the IRS did not prove these allegations by a preponderance of the evidence.

actually intended to evade his tax debt through the conduct alleged.  Rather, the IRS argues, it is enough to show that Gayton voluntarily and intentionally committed the specific acts and omissions, and Gayton's intention vis-a-vis his taxes at the time the acts or omissions occurred is not relevant.

The IRS advances three main arguments in support of its position.  First, it contends that the Tenth Circuit, following four other circuits, "outright reject[s] that specific, or fraudulent, intent is required in § 523(a)(1)(C) willful evasion cases."[97] Second, it argues that "willful" for the purpose of  § 523(a)(1)(C) should be interpreted as it is in civil penalty cases, which do not require specific intent.[98]  Finally,  the IRS contends that the definition of "willful" established by the United States Supreme Court in <u>Kawaauhau v. Geiger</u>[99] for the purpose of determining exceptions to discharge under § 523(a)(6) is inapplicable to the same word used in § 523(a)(1)(C).[100]  The Court will examine each argument in turn.

1.     *Circuits arguably rejecting the subjective intent mental state*

The IRS contends that the Tenth Circuit, in the case of <u>In re Vaughn</u>,[101] and the Third, Fifth, Sixth, and Eleventh Circuits, all hold that to except a tax debt from discharge under § 523(a)(1)(C), the IRS must show that the debtor "had a duty to pay taxes under the law,

---

[97]<u>Id</u>. at 9-10.

[98]<u>Id</u>. at 12.

[99]523 U.S. 57 (1998).

[100]Trial Brief at 14.

[101]765 F.3d 1174 (10th Cir. 2014).

knew he had that duty, and voluntarily and intentionally violated that duty."[102] The IRS takes the position that under this test, these same courts hold that the "debtor's actions will be willful if done voluntarily, consciously or knowingly, and intentionally,"[103] and that the debtor's subjective intent regarding evasion of taxes is irrelevant. The Court disagrees.

In Vaughn, the Tenth Circuit noted that the bankruptcy court applied two inter-related tests to determine "*intent* to evade tax."[104] The first was derived from Dalton, the seminal case on § 523(a)(1)(C) in the Tenth Circuit, which states that a debtor's actions are "willful" if they are done "voluntarily, consciously or knowingly, and intentionally."[105] The Tenth Circuit then noted "that § 523(a)(1)(C)'s mental state requirement is generally satisfied 'where the government shows the following three elements: 1) the debtor had a duty under the law; 2) the debtor knew he had a duty; and 3) the debtor voluntarily and intentionally violated that duty.'"[106] Notably, under this test, the words "voluntarily and intentionally"

---

[102]Id. at 9 & n.30, *citing* Vaughn, 765 F.3d at 1181, In re Fegeley, 118 F.3d 979, 984 (3d Cir. 1997); United States v. Fretz (In re Fretz), 244 F.3d 1323, 1330 (11th Cir. 2001); United States v. Coney, 689 F.3d 365, 374 (5th Cir. 2012); and In re Gardner, 360 F.3d 551, 558 (6th Cir. 2004).

[103]Trial Brief at 9.

[104]Vaughn, 765 F.3d at 1180 (emphasis added).

[105]Id. at 1181, *quoting* Dalton, 77 F.3d at 1302.

[106]Id. This test is consistent with BLACK'S LAW DICTIONARY's definition of "willfulness," to-wit:

> 1. The quality, state, or condition of acting purposely or by design; deliberateness; intention. *Willfulness does not necessarily imply malice, but it involves more than just knowledge. 2. The voluntary, intentional violation or disregard of a known legal duty.

modify the phrase "violate that duty."  Evidence must be sufficient to infer that the debtor

engaged in conduct that resulted in the non-payment of taxes with *intent to violate the duty*

to report and/or pay taxes. Anything less renders the test meaningless.[107]

In the <u>Vaughn</u> case, the audacity of the debtor's conduct supported a finding that he

intentionally violated his duties to report and pay taxes, or in other words, that he willfully

attempted to evade or defeat the taxes. The debtor was a sophisticated businessman who sold

his start-up venture and pocketed more than $31 million in cash and stock.  He immediately

turned to an accounting firm for a tax strategy, and through a complicated series of short-

term loan and investment transactions, the debtor achieved large paper tax losses to offset

the capital gains he earned from selling his company.  The court found that the debtor was

financially savvy enough to know that the scheme was an abusive tax shelter with no

economic basis.  After the debtor was given notice by the investment's promoter that the tax

shelter was likely to be declared a sham by the IRS, the debtor embarked on a spending

spree, divorced his wife (who received half of the assets), purchased real estate in the name

of his girlfriend (later, wife), and transferred a large amount of cash to a trust for the benefit

of his new wife's daughter.  When he divorced his second wife, he acquiesced in her property

---

<u>Id</u>. (10th ed. 2014).

[107]The Court acknowledges that the standard for determining willfulness proposed by the IRS has been adopted and applied in some circuits.  <u>See, e.g.,</u> <u>Coney</u>, 689 F.3d at 374 ("The Government need only establish that a debtor voluntarily and intentionally committed or attempted to commit an affirmative act or culpable omission that, under the totality of the circumstances, constituted an attempt to evade or defeat the assessment, collection or payment of a tax; the debtor need not have made their attempt with the specific intent to defraud the IRS.").

division proposal in which she received the most valuable property. Only then did he voluntarily disclose to the IRS his participation in the tax scheme, and at that point, he pleaded poverty. After filing bankruptcy, the debtor sought to discharge in excess of $14 million in taxes, was unsuccessful, and appealed the bankruptcy court's decision.

It was not error, concluded the Tenth Circuit, to infer from the debtor's conduct that the debtor acted "willfully," or with the "intent to evade tax[es]"[108] In adopting and applying

---

[108]Vaughn, 765 F.3d. at 1180-81. Generally, when a debtor is found to have "willfully attempted" to evade tax obligations for the purpose of § 523(a)(1)(C), the evidence consists of egregious and contemptuous behavior on the part of the debtor. For instance, in Birkenstock, the debtor had a long history of challenging the legitimacy of our monetary system, failed to report income, was convicted for failure to file returns for many years, failed to pay fines imposed upon conviction, transferred all assets to family trust for the benefit of his children without receiving equivalent value while continuing to enjoy the beneficial interest in the assets, and never voluntarily made any payment toward his tax liabilities. The court found that the conduct was not based on mistake, inadvertence or confusion, and warranted a finding that debtor "specifically intended to avoid known tax liability." Birkenstock, 87 F.3d at 952.

In Gardner, the debtor, a personal injury attorney, deposited a total of almost $400,000.00 – his share of fees earned on settlements – in nominee accounts in the name of his secretary and her husband, and in his wife's former married name, and did not disclose the accounts or funds to the IRS in connection with offers in compromise and installment payment plans. In addition, the debtor made other misrepresentations to induce the IRS to defer collection activity. Meanwhile, the debtor indulged in a lavish lifestyle that included golfing junkets and vacations in Europe and the Caribbean, as well as multiple country club memberships. The debtor testified that he was hiding his money from the state taxing authorities, but the bankruptcy court concluded that the debtor also intended to conceal funds from the IRS. The Sixth Circuit affirmed, concluding the circumstances sufficient to allow the court to reasonably infer that the debtor willfully attempted to evade paying his tax liabilities. See In re Gardner, 360 F.3d 551 (6th Cir. 2004).

In Mitchell, the debtor, a real estate agent, failed to file returns for five years, resulting in substantial taxes, penalties and interest. Thereafter, the debtor admitted that he purchased and maintained various homes in his wife's name to avoid the imposition of a tax lien. After the IRS issued levies on his commissions and on his personal bank account, the debtor admitted that he formed a new company in which his wife was sole shareholder and that he

the standards set forth above, the <u>Vaughn</u> court did not endorse the watered-down standard of "willfulness" embraced by the IRS in this case.  The evidence was sufficient to infer the debtor's subjective intent to evade the IRS's collection efforts.

It cannot be, and is not, the law that simply voluntarily, knowingly and intentionally spending money while knowingly owing taxes renders the tax debt non-dischargeable. "[N]onpayment [of taxes], by itself, does not compel a finding that the given tax debt is nondischargeable."[109]  "Nonpayment, without more, evidences 'not dishonesty but [] the defining characteristic of all debtors – honest and dishonest alike – insufficient resources to honor all of [one's] obligations.'"[110] A debtor's failure to prioritize outstanding tax debt over other living expenses does not by itself show an attempt to evade or defeat the assessment, payment, or collection of taxes.  The word "evade" itself is not a neutral term, but connotes dodging, eluding, avoiding, hiding, making oneself unavailable, or being less than candid.[111] And the ordinary meaning of the word "defeat" is to destroy, beat, conquer, overcome,

---

deposited his commissions in the corporation's account and his wife's MaryKay business account to avoid any levy of his business property or income. The debtor proposed several offers in compromise and installment plans to stop collection activity.  The couple lived lavishly, purchased time shares, and donated $81,000.00 to their church.  The bankruptcy court found insufficient evidence to support a conclusion of willfulness.  The Eleventh Circuit reversed the bankruptcy court because the record contained "overwhelming evidence of Mitchell's willful intent to evade his taxes," including direct evidence (debtor's admissions) that debtor took deliberate actions to frustrate the assessment and collection of taxes.  <u>United States v. Mitchell (In re Mitchell)</u>, 633 F.3d 1319, 1328  (11th Cir. 2011).

[109]<u>Dalton</u>, 77 F.3d at 1301.

[110]<u>Birkenstock</u>, 87 F.3d at 951.

[111]Merriam-Webster, https://www.merriam-webster.com/dictionary/evade, accessed on March 20, 2018.

vanquish, nullify, or frustrate.[112]  Congress chose these words – words that implicate an intent

to undermine, harm, conceal, or deceive – to describe conduct that warrants excepting taxes

from discharge.

In its Trial Brief, the IRS argues that only the Ninth Circuit requires the government

to prove that the debtor actually intended to evade taxes under § 523(a)(1)(C),[113] and in a

footnote in support of that remarkable assertion, quotes a portion of the Ninth Circuit case

of Hawkins v. Franchise Tax Board of California,[114]as follows:

> "Some of our sister circuits [citing *Vaughn, Coney, Gardner, Fretz, Fegeley,*
> *Birkenstock,* and *Dalton*] have read 11 U.S.C. § 523(a)(1)(C) *differently*,
> interpreting the statute to require the government to show that the debtor "(1)
> had a duty to pay taxes under the law, (2) knew he had that duty, and (3)
> voluntarily and intentionally violated that duty ... [t]o the extent that these
> cases can be construed, as the government does, as holding that a tax debt
> cannot be considered dischargeable if the acts were committed intentionally,
> but not necessarily for the purpose of evading taxation, we respectfully
> disagree" (emphasis added).[115]

In this passage, the Ninth Circuit disagreed with the *government's interpretation* of the

holdings of these cases.  It did not expressly deviate from the standard adopted by the other

circuits with respect to the mental state required under § 523(a)(1)(C) as the IRS contends.

In fact, the Ninth Circuit observed that its sister circuits *did* require proof of some purposeful

---

[112]Merriam-Webster, https://www.merriam-webster.com/dictionary/defeat, accessed on March 20, 2018.

[113]Trial Brief at 10.

[114]769 F.3d 662 (9th Cir. 2014).

[115]Trial Brief at 10 n.37.

evasive conduct to reach the threshold of willfulness, which was consistent with the Ninth

Circuit's view.

> [M]ost of the cases involve intentional acts or omissions *designed to evade taxes*, such as criminal structuring of financial transactions to avoid currency reporting requirements (Coney, 689 F.3d at 369 [5th Cir.]); concealing assets through nominee accounts (Vaughn, 2014 WL 4197347 at *6 [10th Cir.]; Gardner, 360 F.3d at 559 [6th Cir.]; Birkenstock, 87 F.3d at 952 [7th Cir.]); concealing ownership in assets (Vaughn, 2014 WL 4197347 at *6; Dalton, 77 F.3d at 1302 [10th Cir.]); and failing to file tax returns and pay taxes (Fretz, 244 F.3d at 1329 [11th Cir.]; Fegeley, 118 F.3d at 984 [3d Cir.]). *These actions are not inconsistent with a specific intent requirement.* And, although lavish lifestyle and ability to pay taxes have been mentioned by some Circuits, see, e.g., Vaughn, 2014 WL 4197347 at *6, no Circuit has held that living beyond one's means alone constitutes willful tax evasion, and no circuit has held that failure to pay taxes, by itself, constitutes willful tax evasion within the meaning of that clause in § 523(a)(1)(C).[116]

The case law on the topic of the mental state component of § 523(a)(1)(C) is

inconsistent, unsettled, and generally result-oriented.  This Court finds itself generally in

agreement with the majority opinion in Hawkins, for all the reasons stated therein, and

likewise concludes that requiring the IRS to establish a debtor's subjective intent, through

direct or circumstantial evidence, is not inconsistent with any Tenth Circuit or Supreme

Court precedent binding on this Court.

> 2.     *Civil vs. criminal mental state*

The IRS also contends that the mental state component of Section 523(a)(1)(C) is

equivalent to that required in a civil tax proceeding, and that requiring proof that a debtor's

acts or omissions were done for the purpose of evading taxation would be akin imposing a

criminal standard for willfulness in a civil bankruptcy case.  Under this argument, the IRS

---

[116]Hawkins, 769 F.3d at 669 (emphasis added).

would expand the definition of willfulness to include standards used in civil tax cases, such as reckless violations of a standard[117] and "reckless disregard of a statutory duty."[118]

It is worth noting at this point that the language of § 523(a)(1)(C) tracks almost verbatim that of the criminal tax evasion statute, 26 U.S.C. § 7201 ("IRC § 7201"), which provides that "[a]ny person who willfully attempts in any manner to evade or defeat any tax . . . or the payment thereof shall . . . be guilty of a felony."  This same phrase is also contained in 26 U.S.C. § 6672 ("IRC § 6672"), a civil tax statute that penalizes a "responsible person" who fails to collect or turn over required payroll withholding taxes (trust fund taxes) to the IRS.

In cases under IRC § 7201, the Supreme Court has held that "[w]illfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty."[119] This is the exact standard for "willfulness" adopted by the Tenth Circuit (and other circuits) as applicable in § 523(a)(1)(C) cases.[120]

---

[117]Trial Brief at 12, *quoting* Safeco Ins. Co. of America v. Burr, 551 U.S. 47, 57 (2007).

[118]Trial Brief at 13 n.51, *quoting* United States v. McBride, 908 F. Supp. 2d 1186, 1204 (D. Utah 2012).

[119]Cheek v. United States, 498 U.S. 192, 201 (1991).

[120]See, e.g., Vaughn, 765 F.3d at 1181; Gardner, 360 F.3d at 558; Birkenstock, 87 F.3d at 952.

On the civil side, IRC § 6672 imposes on a responsible person, generally a corporate officer or employee, who fails to turn over withholding taxes a penalty equal to the trust funds not collected or turned over (the so-called "100% penalty").[121]  In effect, the statute imposes personally liability on persons who failed to fulfill their fiduciary duties to collect and safeguard trust funds.  For the purposes of enforcing IRC § 6672, courts interpret the "willful" element loosely, so that liability may be based upon a finding of a "voluntary, conscious and intentional decision to prefer other creditors over the Government."[122]  "It is well-settled § 6672 liability does not depend upon the presence of a bad motive or the specific intent to defraud the government – elements associated with criminal liability."[123] This less culpable standard of "willfulness" seems appropriate in the § 6672 context because each dollar paid to other creditors depletes the fund the responsible person is required to *hold in trust* for the government.  This is the standard that the IRS contends is applicable in this case (*i.e.*, Gayton knew he owed taxes but spent his resources on things other than taxes), notwithstanding that Gayton was not a "responsible person" tasked with a duty to collect withholding taxes, and notwithstanding that the money he spent was not held in trust for the government.

---

[121]See, e.g., Denbo v. United States, 988 F.2d 1029, 1031 (10th Cir. 1993).

[122]Id. at 1033 (quotation marks and citation omitted).  In Denbo, the Tenth Circuit noted that "[t]his definition of willfulness has been adopted by every jurisdiction which has reached this issue."  Id. at 1033 n.3.

[123]Finley v. United States, 123 F.3d 1342, 1344 (10th Cir. 1997).

In the context of imposing civil penalties for the diversion of trust funds, however, the Tenth Circuit still construes "willful" as a subjective state of mind.  In <u>Finley v. United States</u>,[124] the Tenth Circuit, *en banc*, interpreted the word "willfully" in IRC § 6672, as follows:

> Although the precise definition of "willful" varies somewhat depending on its context, <u>Screws v. United States</u>, 325 U.S. 91, 101 . . . (1945), one thing is certain: in any context, the word "willfully" denotes a "conscious motion of the will," Black's Law Dictionary 1434 (5th ed. 1979), or "mental faculty" giving rise to a particular course of action. Webster's II New Riverside University Dictionary (1988).  In this context, then, an inquiry whether a responsible person "willfully" failed to pay withholding taxes is "'necessarily directed to the state of the responsible person's mind,'" <u>Thibodeau v. United States</u>, 828 F.2d 1499, 1505 (11th Cir. 1987) (quoting <u>Mazo v. United States</u>, 591 F.2d 1151, 1157 (5th Cir.), *cert. denied*, 444 U.S. 842 . . .(1979)), and therefore is properly characterized as an issue of scienter—"the quintessential jury issue." <u>Turpin v. United States</u>, 970 F.2d 1344, 1350 (4th Cir. 1992) (court upheld jury verdict in favor of taxpayer, concluding sufficient evidence existed for jury reasonably to conclude taxpayer neither knew of nor recklessly disregarded withholding tax delinquency). To deprive a jury of the opportunity to fully evaluate the conscious motions supporting a responsible person's conduct would be to deprive the word "willfully" of its operative effect.[125]

It is true that § 523(a)(1)(C) is not a criminal statute.  But the Bankruptcy Code does not hold the IRS to the standard of proof required in a criminal case.  To establish criminal tax evasion, every element of the statute must be proven beyond a reasonable doubt,[126] while the standard of proof to except a debt from discharge under § 523 is by a preponderance of

---

[124]123 F.3d 1342 (10th Cir. 1997).

[125]<u>Id</u>. at 1347.

[126]<u>See</u> <u>Holland v. United States</u>, 348 U.S. 121, 138 (1954).

the evidence.[127]   Accordingly, to meet its burden under § 523(a)(1)(C), the IRS must prove

that the debtor more likely than not willfully attempted to evade or defeat a tax debt, a lower

standard of proof than required for conviction in a criminal case.

3.   <em>Kawaauhau v. Geiger</em>

In <u>Kawaauhau v. Geiger</u>,[128] the United States Supreme Court interpreted the term

"willful" in the context of another subsection of § 523(a). Under § 523(a)(6), debts "for

willful and malicious injury by the debtor to another entity or to the property of another

entity"[129] are not dischargeable.  In <u>Geiger</u>, the "pivotal question" was whether § 523(a)(6)

encompassed "acts, done intentionally, that cause injury" or "only acts done with the actual

intent to cause injury."[130]   Noting that the word "willful" modifies the word "injury," the

justices concluded that the discharge exception applied only if it is established that the debtor

intended the consequences of the act, that is, intended to inflict injury.[131]  Simply engaging

in an act that caused an injury was not sufficient to constitute willfulness.[132]

---

[127]<u>Grogan v. Garner</u>, 498 U.S. 279 (1991). "[T]he preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants[.] [W]e presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'" <u>Id</u>. at 287 (citations omitted).

[128]523 U.S. 57 (1998).

[129]11 U.S.C. § 523(a)(6).

[130]<u>Geiger</u>, 523 U.S. at 61.

[131]<u>Id</u>. at 61-62.

[132]<u>Id</u>.

[A] more encompassing interpretation could place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, *i.e.*, neither desired nor in fact anticipated by the debtor. Every traffic accident stemming from an initial intentional act – for example, intentionally rotating the wheel of an automobile to make a left-hand turn without first checking oncoming traffic – could fit the description . . .  A "knowing breach of contract" could also qualify. . . .  A construction so broad would be incompatible with the "well-known" guide that exceptions to discharge "should be confined to those plainly expressed."[133]

"The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning" and "the presumption that a given term is used to mean the same thing throughout a statute is at its most vigorous when a term is repeated within a given sentence."[134]  The word "willful" appears in § 523(a)(1)(C) and later in the same sentence in § 523(a)(6), and therefore the Supreme Court's interpretation of the word for the purpose of § 523(a)(6) is presumed to apply for the purpose of § 523(a)(1)(C).  Under the reasoning of Geiger, in § 523(a)(1)(C), "willfully"

---

[133]Id. at 62 (citations omitted).  The Supreme Court has also spoken on the mental state required to except from discharge debts resulting from "defalcation" and "fraud."  In Bullock v. BankChampaign, N.A., 569 U.S. 267 (2013), the justices held that under § 523(a)(4), which excepts from discharge debts "for fraud or defalcation while acting in a fiduciary capacity," the creditor had to prove that the debtor acted with wrongful intent or in conscious disregard of his fiduciary duties.  Id. at 274.  Likewise, the Supreme Court has long held that debts arising from fraud are dischargeable only in cases of "positive fraud or fraud in fact, involving moral turpitude or intentional wrong, . . . and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality."  Neal v. Clark, 95 U.S. 704, 709 (1877); *accord* Husky Int'l Electronics, Inc. v. Ritz, 136 S.Ct. 1581, 1586 (2016).  In addition, in Spies, in the context of criminal tax evasion, the Supreme Court interpreted the phrase "willfully attempts in any manner to evade or defeat any tax" as requiring a "willful and positive attempt to evade tax" rather than a passive failure to pay taxes.  Spies, 317 U.S. at 498-99.

[134]In re Woods, 743 F.3d 689, 697 (10th Cir. 2014) (quotation marks and citations omitted).

modifies "attempted in any manner to evade or defeat such tax." The statute is unambiguous that the "attempt . . . to evade" is the conduct that must be intentional. Thus, voluntary, intentional acts (*i.e.*, using one's earnings to renovate a home, contributing to charity, gambling, signing documents that contain errors) do not constitute "willful[] attempt[s] . . . to evade" unless the evidence is also sufficient to infer that the debtor committed the conduct in order to prevent or frustrate the assessment or collection of taxes.

Exceptions from discharge are narrowly construed so that honest but debt-plagued debtors may reap the Bankruptcy Code's promise of a "fresh start." By requiring proof that a debtor "voluntarily, consciously or knowingly, and intentionally"[135] tried to evade or defeat a known tax obligation, § 523(a)(1)(C) preserves the discharge for debtors whose non-reporting of income or non-payment of taxes arises not from some tax or payment avoidance scheme, but from negligence, inadvertence, mistake, confusion, or simply a lack of sufficient resources to pay the debt.[136]

B.    Analysis

Did the IRS meet its burden of proving Gayton willfully–that is, voluntarily, consciously and intentionally–attempted to evade the payment or collection of the outstanding tax debt? The Court finds that it did not. In particular, the Court finds that certain of the facts and circumstances that the IRS relies upon to establish willful evasion were more likely than not the consequence of inadvertence, mistake, and/or confusion due

---

[135]Dalton, 77 F.3d at 1302.

[136]See Birkenstock, 87 F.3d at 952.

to language barriers and Gayton's lack of sophistication regarding financial and accounting matters.  Other circumstances, such as the Gayton's expenditures on what the IRS deemed luxuries, were more likely than not motivated by legitimate business, family support, and/or charitable reasons than by tax avoidance.  Further, the Court finds and concludes that Gayton's failure to pay more of the additional tax debt assessed following the audits is more likely than not a result of the drastic decline in business opportunities and income, through no fault of his own, than tax evasion.[137]

### 1. *History of reporting and payment*

As evidence of indifference and defiance on tax matters, the IRS contends that Gayton "ha[d] a long history of ignoring his obligations" to pay taxes; "understated his income on tax returns for subsequent years"; "fail[ed] to keep adequate books and records"; and "willfully undervalued his residence by several hundred thousands of dollars" in statements made in connection with an offer in compromise of the unpaid taxes.[138]  The Court finds that in this case, the alleged conduct is more consistent with mistake or confusion than with willful evasion or concealment.

The totality of the evidence negates that Gayton had a "long history of ignoring his obligations" to pay taxes.  Gayton filed his tax returns on time in every relevant year except 2007, remitted thousands of dollars to the IRS in payment of taxes with his returns, paid installments in conjunction with the OIC, and hired professionals to assist him  in complying

---

[137]The Court's findings and conclusions would be the same under the reckless disregard standard suggested by the IRS.

[138]Trial Brief at 1.

with the complexities of the tax laws.  Gayton did not engage in tax avoidance schemes or shelters. On the whole, Gayton was an attentive and compliant taxpayer who relied in good faith on professionals, and he followed their advice.

The IRS failed to prove that Gayton intentionally "understated his income" in the years after the audit to "conceal[] a potential collection source."[139]  Again, Gayton relied in good faith on his accountants to prepare the corporation's returns, and to transfer the relevant information from the corporation's Schedule K-1s to Gayton's personal tax returns. Although Gayton's expenses may have exceeded the taxable income reported on Gayton's personal tax returns, the Schedule K-1 income included deductions of non-cash items that were passed through.  Also, as Gayton testified, others contributed to the household's living expenses.  The IRS did not present any compelling evidence that Gayton earned income that was not reported on the corporation's tax returns or on Gayton's personal tax returns. Speculation is not evidence.

With respect to Gayton's maintenance of books and records, the Court concludes that at all relevant times after the 2009 IRS "official notice" letter, Gayton maintained records that enabled him to calculate his tax liabilities.[140]  His business model was simple and his

---

[139]Id. at 4.

[140]The letter provided Gayton "official notice" that he was required by law to keep records containing the following information:

(1) The date and a description of each transaction you engaged in.
(2) The date and amount of each item of gross income received.
(3) A description of the nature of income received.
(4) The date and amount of each payment you made.
(5) The name and address of the payee.

accounting was on a cash basis.  He did not have any long term accounts payable or receivable.  He and his workers painted houses.  Gayton's corporation was paid for the work upon completion. Gayton deposited the gross revenue into the corporation's bank account. Gayton paid his workers and business expenses from that bank account. A general ledger, balance sheet, and income statement were not necessary for determining the corporation's gross income and appropriate deductions because all money coming in and out of the business was run through the checking account.  Gayton's vendors kept records of the corporation's purchases of materials and supplies, which they provided to Gayton.  The bank records, vendor statements, and customer invoices provided documentation of the types of financial information described in the "official notice" letter as being "required by law."[141]

Gayton did in fact misrepresent the value of and equity in his Homestead in the statements supporting his offer in compromise.  Gayton, having a limited comprehension of written English, did not read the OIC or Forms 433-A and 433-B before signing them. Gayton also lacked sophistication regarding technical financial and accounting concepts. Gayton trusted Cuevas to complete the forms correctly.  Mistakes were made.  The evidence is not sufficient to infer that Gayton knew the documents were not accurate when he signed them and submitted them to the IRS.

---

(6) A description of the nature of each payment.

IRS Exhibit 16.

[141]Id.

With respect to the IRS's allegation that Gayton continued to hide the actual value of the Homestead by refusing to provide the IRS with an appraisal, Gayton admitted at trial that he could have obtained an appraisal in response to the IRS's request in 2014, but he did not do so.  He also admitted that he did not tell Cuevas or the IRS about the 2009 appraisal.  The IRS, however, already possessed evidence that the Homestead was worth at least $317,000.00, and the revenue officer told Cuevas that without an appraisal, the IRS would use the $317,000.00 figure in evaluating the OIC.  Thus, the IRS left Gayton with a choice – he could provide an appraisal or not.  Gayton did not "refuse" to obtain an appraisal for the IRS; he simply chose one of two options presented by the IRS.

Based on its own valuation, the IRS rejected the OIC.  The fact that Gayton did not hire an appraiser or provide the IRS with the five-year-old appraisal did not interfere with and had no material effect upon the IRS's ability to evaluate the OIC.

2.   *Expenditures on discretionary items*

As stated above, while the IRS contends Gayton spent extravagantly on luxury items as a means to willfully avoid paying his taxes, its evidence is not compelling.  First, Gayton could not have had tax evasion in mind when he chose to add a second story to his residence. The Court notes that the IRS first gave Gayton notice that it was auditing his 2005 and 2006 tax returns in April 2008. In 2005 and 2006, Gayton had already invested about $40,000.00 making improvements on the Homestead, building a shop and storage facility, installing fencing and gates, remodeling the kitchen, installing wood floors and crown moldings, and adding a jacuzzi bath.  In 2007, again, well before Gayton was aware that he might owe additional taxes, he started on the second story expansion.  Thereafter, Gayton, and the

construction and housing sector in general, experienced a sudden loss of business, and consequently, an unexpected decline in income. In order to finish the renovation, Gayton scavenged discarded materials from job sites and obtained defective materials that builders could not use in their construction projects, bought discontinued materials and discounted supplies, found inexpensive appliances on Craigslist, and performed the labor himself and with the help of friends and relatives.  The renovation took at least six years to complete. Instead of borrowing against the Homestead to complete the remodeling, Gayton engaged in belt-tightening.  In the end, the value of the Homestead increased substantially, but Gayton was extremely frugal, and the amount actually spent to improve the Homestead was modest.

Gayton did not conceal his ownership of the Homestead, or transfer the property to his wife or a relative, or otherwise attempt to impede the IRS from exercising an interest in the Homestead.  Instead, he invested his own labor to increase the value of an asset that to this day remains available to satisfy tax debts.

The cost of feeding and maintaining the family's two horses was inconsequential and thus the Court cannot infer from that conduct any intent to evade taxes.

The $700.00 monthly payments Gayton made to lease a 2007 Cadillac Escalade in 2007 and 2008 again predated the point in time that Gayton became aware that the IRS intended to audit his 2005 and 2006 returns.  Those taxes were not assessed until 2009. Accordingly, the Court cannot infer that those payments were made in an attempt to avoid paying taxes.

In 2011 and 2012, after additional taxes had been assessed, Gayton paid approximately $800.00 per month for a 2011 Jaguar.  Rather than intending to avoid paying

taxes, however, Gayton intended, by driving a nice vehicle, to represent himself as successful and reputable in order to attract business. Gayton would have made installment payments for some vehicle in some amount in any event, and the Court cannot find that paying $800.00 per month rather than, say, $500.00 per month, over the period of about a year is so excessive that an intent to evade paying taxes may be inferred.

Gayton contributed $4,000.00 to his church because the church was in need of materials to build housing for homeless immigrants. Gayton's charitable motivation is corroborated by the fact that he also volunteered his labor to help with the remodeling.[142] This singular gift is not indicative of an intent to evade paying taxes.

Both before and after additional taxes were assessed, Gayton gambled occasionally at casinos for entertainment. After the assessment, the total amount Gayton withdrew from bank accounts at ATM's located in casinos was $34,687.26 – an average of less than $5,000.00 per year. Occasional gambling for entertainment is not, by itself, indicative of an intent to evade paying taxes.

To summarize, these discretionary expenditures were not so unusual, excessive, or extravagant as to make it more likely than not that Gayton made them with the intent to avoid paying his tax debts. Significantly, there is no evidence that Gayton transferred assets to others, or intentionally concealed assets from the IRS, or attempted in any manner to render his assets unreachable. The evidence that was offered to show that Gayton lived large and dissipated his estate in order to stymie the IRS's collection efforts is thin and unpersuasive.

---

[142] Id., ¶ 6.

### 3. *Lack of efforts to pay taxes*

The IRS claims that Gayton "refused to sell [his residence] or borrow against the equity in the property to pay his tax liabilities" and "failed to make any meaningful attempt to pay his federal tax liabilities."[143]

At his deposition, Gayton testified that he wanted to keep the property as a home for himself and his family, and did not want to sell it to pay the IRS.  The IRS presented evidence, however, that Gayton had listed his Homestead for sale at various points in time after the taxes were assessed. Gayton also testified that he never envisioned borrowing against his Homestead to pay the taxes.  His bankruptcy filing has now foreclosed his ability to borrow.  Gayton's expressed preference for keeping his Homestead is not indicative of tax evasion.

Finally, at no time did Gayton have the resources to pay in excess of $250,000.00 in back taxes from his income or from financial assets.  Gayton's efforts to reduce the burden, by challenging the audit findings, pursuing a compromise of the overwhelming tax debt, and appealing the rejection of the OIC, were made in good faith, and do not evidence an intent to evade or defeat payment of the taxes.

Gayton paid his bills as they came due to maintain an ordinary, perhaps frugal, lifestyle.  He paid current taxes to the best of his financial ability, and made installment payments to the IRS until the OIC was rejected. Gayton's efforts to pay his taxes were consistent with his ability to pay them.

---

[143]IRS's Trial Brief (Adv. Doc. 32) at 1.

**IV.    Conclusion**

For the reasons stated above, the IRS did not meet its burden of establishing that Gayton's debt to the IRS for tax years 2005, 2006 and 2009 should be excepted from discharge.  A judgment in favor of Gayton will be entered contemporaneously herewith.

**SO ORDERED** this 10th day of April, 2018.

DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE